UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MAIN & CHAMP FOOD & DELI,
INC.,** *et al.*,

    **Plaintiffs,**

                                                                     **Civil Action 2:10-cv-00145**
       **v.**                                                     **Magistrate Judge E.A. Preston Deavers**

**THE UNITED STATES OF AMERICA
SECRETARY OF AGRICULTURE,**

    **Defendant.**

## OPINION AND ORDER

Plaintiffs, Main & Champ Food & Deli, Inc., and Belal Alrawahneh, bring this action challenging the Food and Nutrition Services' ("FNS") decision to permanently disqualify them from the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamp Program.[1] Within their Complaint, Plaintiffs also briefly allege that Defendant has violated their procedural and substantive due process rights. This matter is before the Court for consideration of Defendant's Motion for Summary Judgement.[2] Defendant maintains that the record contains no material facts that are in dispute, food stamp trafficking occurred in Plaintiffs' store, and, therefore, FNS appropriately disqualified Plaintiffs from the SNAPS program. Plaintiffs, however, maintain that the trafficking that occurred was the result of a third party who was in possession of the store at the time in question. For the reasons that follow, Defendant's

---

    [1] FNS is an agency within the Department of Agriculture and is responsible for implementing SNAP.

    [2] In support of their Motion, Defendant has filed certified copy of the Administrative Record (cited as "R."). Plaintiffs have also relied on the Administrative Record in opposing Defendant's Motion.

Motion for Summary Judgment (ECF No. 22) is **GRANTED**.

## I.  BACKGROUND

Belal Alrawahneh formed Main & Champ Food & Deli Inc. (hereinafter "Main & Champ") as an Ohio Corporation.  In December 2008, Main & Champ, represented by Belal Alrawahneh, entered into an agreement to purchase "Champion Market" from 1130 B Champion, Inc., a corporation owned by Tarik S. Arikat.  (R. at 179–81.)  Under the terms of the agreement, the closing of the sale would occur on the date of the transfer of the relevant liquor permit.  From the time of the agreement until the time of closing, Belal Alrawahneh and his brother, Atef Alrawahneh, operated and managed Champion Market.[3]

In February 2009, the liquor permit transferred from 1130 B Champion Inc. to Main & Champ.  On February 24, 2009, Main & Champ, dba Champion Market, applied to participate in SNAP.  (R. at 1–6.)  As part of the application process, Belal completed and signed a "Food Stamp Application for Stores" form.  On the form, Belal indicated that Champion Market opened under his ownership on February 23, 2009.  Pursuant to this Application, Belal "accept[ed] responsibility on behalf of the firm for violations of the Food Stamp Program regulations, including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time."  (R. at 2.)  Additionally, Belal acknowledged that he was "responsible for reporting changes in the firm's ownership, address, type of business and operation to the [FNS]."  (*Id.*)  Champion Market received a license to participate in SNAP in March 2009.

In the following months, FNS became suspicious of Champion Market's food stamp activity.  Consequently, FNS analyzed Champion Market's Electronic Benefit Transfer (EBT)

---

[3] As the two brothers share the same last name, for ease of reference, the Court will refer to Messrs. Alrawahneh by their first names, Atef and Belal.

transactions for May, June, and July 2009.[4]  On August 17, 2009, an FNS representative visited Champion Market.  The representative categorized Champion Market as a Medium/Small Grocer and recorded the types of products it sold.

In September 2009, FNS wrote a letter addressed to Belal as owner of Champion Market charging the firm with food stamp trafficking.  The letter highlighted that an investigation had revealed "clear and repetitive patterns of unusual, irregular, and inexplicable activity . . . ."  (R. at 16.)  These activities fell within four basic categories: multiple purchase transactions made too rapidly to be credible; multiple transactions made from individual benefit accounts in unusually short time frames; exhausting of the majority or all of individual recipient's benefits within an unusually short period; excessively large benefits made from recipient accounts.  (*Id.*)  FNS enclosed a listing of the suspect transactions with the charge letter.[5]  (*See* R. at 18–49.)

In October 2009, FNS issued its determination letter to Champion Market concluding that the violations cited in the charge letter had occurred and finding that the firm was permanently disqualified from SNAP.  (R. at 149–50.)  FNS also detailed in the October 2009 determination letter that there was inadequate evidence of an effective compliance policy and program to prevent violations, and, therefore, a monetary penalty in lieu of disqualification was inappropriate.  On January 22, 2010, FNS issued a final agency decision, finding that Champion Market had committed violations of SNAP and that sufficient evidence supported the determination to permanently disqualify it from participation in the program.

---

[4] SNAP operates off of an electronic system utilizing "EBT cards" to deliver benefits to participants.  SNAP participants use an EBT card at authorized retails stores to buy eligible foods.  FNS is able to electronically monitor EBT transactions.

[5] Additionally, the Administrative Record contains FNS case-summary materials created after the charge letter was sent.  (R. at 112–48.)

During the administrative review process, Plaintiffs submitted evidence in the form of affidavits and other documentation in an attempt to avoid disqualification and/or mitigate any penalty. In submitting evidence, Plaintiffs do not dispute that trafficking occurred. Rather, Plaintiffs contend that a third-party, Maysaa M. Salah, was solely responsible for the violations. Atef avers that on January 27, 2009, he, acting under power of attorney for his brother, offered to sell Champion Market to Ms. Salah. Ms. Salah "wanted to test the business for a couple months before she would buy it" and apparently took over operation of the store on January 29, 2009. (R. at 174.) Belal added Ms. Salah as a cosigner on the business' bank account. According to Atef, soon after, she changed the password to the account. Upon Atef's request, Ms. Salah gave him the new password. Sometime in Spring of 2009, Ms. Salah requested to open a new bank account for the business, which only she could access. Atef agreed to this on the condition that the food stamp license would be removed from the store, and, therefore, Ms. Salah would not be able to process EBT transactions.[6] Accordingly, Atef removed the food stamp license from the store.

Atef maintains that on July 10, 2009 he contacted Ms. Salah because it was "time to transfer the license and sign the purchase agreement." (R. at 175.) Ms. Salah refused to carry out the agreement. Accordingly, Atef regained control over the operations of Champion Market. Ms. Salah's last day in the store was July 28, 2009.[7]

---

[6] In responding to the charge letter, Plaintiffs' initial attorney suggested that Belal also removed EBT processing machinery from the store. (R. at 57.) Atef and Belal's affidavits are less clear as to whether they removed such equipment at this time. (*See* R. at 175.) Construing the facts most favorably to Plaintiffs, the Court accepts the assertion that Plaintiffs removed the machine.

[7] Atef and Belal contend that since they personally started accepting EBT cards on July, 28, 2009, they have implemented a written food stamp policy that every employee has read and

After receiving the September 2009 charge letter Belal and Atef investigated what had occurred in the store under Ms. Salah's supervision. They maintain that through a series of fraudulent acts and falsified documentation, and the use of Plaintiffs' FNS authorization number, Ms. Salah was able to obtain EBT processing capability.[8] According to Atef and Belal, Ms. Salah used this capability, as the store-surveillance system partially demonstrates, to commit the EBT transactions in question. In September 2009, once Atef and Belal discovered this information, Atef filed a report with the police.

During the administrative review process, Plaintiffs also submitted the affidavit of Riyad Altallas, an employee of Champion Market during the time in question. Mr. Altallas indicates that during his time at the store—spanning from January 29, 2009 until July 10, 2009—Ms. Saleh was in charge of Champion Market. Furthermore, Mr. Altallas admits that he observed Ms. Saleh completing documentation to allow for EBT processing and subsequently "exchanging food stamps for cash from customers." (R. at 183.)

---

signed. (R. at 177.)

[8] According to Atef and Belal, Ms. Salah opened a bank account with Huntington Bank in the name of 1130 B Champion, Inc., the corporation of Mr. Arikat, which formerly owned of Champion Market. Furthermore, Plaintiffs maintain that she forged an "ACS Merchant EBT Form," in Belal's name, in order to obtain EBT processing. (*See* R. at 79–80.) She also signed her own name, as President of Champion Market, and used Plaintiff"s FNS number, in filling out a Third Party EBT Processing Agreement and Merchant Services Application. (R. at 70–78.)

## II.  STANDARD OF REVIEW

A.     Summary Judgment

Under Federal Rule of Civil Procedure 56(c), the Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When applying this standard the "'mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'"  *Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986)).  An issue of material fact exists when a "'reasonable jury could return a verdict for the nonmoving party.'"  *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010) (quoting *Anderson*, 477 U.S. at 248).

In a motion for summary judgment the moving party "bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law." *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In determining whether a moving party has met its burden, "[t]he evidence must be viewed in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."  *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).  If the moving party satisfies its burden, and the Court has provided adequate time for discovery, "the nonmoving party 'must present significant probative evidence' to demonstrate that 'there is [more than] some metaphysical doubt as to the material facts.'"  *Longaberger*, 586 F.3d at 465 (quoting *Moore v. Philip Morris Cos., Inc.*, 8

6

F.3d 335, 340 (6th Cir. 1993)).

B.     Review Under 7 U.S.C. § 2023

When a participating firm is disqualified from SNAP pursuant to 7 U.S.C. § 2021, it may obtain judicial review of FNS's final determination. 7 U.S.C. § 2023(13). Specifically, the firm is entitled to a *de novo* review before the district court. 7 U.S.C. § 2023(15). In conducting this review, "[a] district court is to make its own findings based upon the preponderance of the evidence and not limit itself to matters considered in the administrative proceeding." *Warren v. U.S.*, 932 F.2d 582, 586 (6th Cir. 1991). Furthermore, "[t]he burden of proof in the judicial review proceeding is upon the aggrieved store to establish the invalidity of the administrative action by a preponderance of the evidence." *Id.*

Although the Court reviews FNS's administrative action *de novo*, the Court's review of any subsequent sanction is limited. *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993). Specifically, the United States Court of Appeals for the Sixth Circuit has held:

> Once the trial court has confirmed that the store has violated the statutes and regulations, the court's only task is to examine the sanction imposed in light of the administrative record in order to judge whether the agency properly applied the regulations, i.e., whether the sanction is "unwarranted in law" or "without justification in fact."

*Goldstein v. U.S.*, 9 F.3d 521, 523 (6th Cir. 1993) (quoting *Woodard v. United States*, 725 F.2d 1072, 1077 (6th Cir. 1984)). In other terms, "[t]he trial *de novo* is limited to determining the validity of the administrative action; the severity of the sanction is not open to review." *Id.*

### III.  ANALYSIS

In this case, the parties do not dispute that food stamp trafficking occurred at Champion Market.[9]  In addition to the significant evidence of suspect EBT transactions within the Administrative Record, the affidavits and documents Plaintiffs have provided, particularly the affidavit of Mr. Altallas, also serve proof that food stamp trafficking occurred at Champion Market.  Plaintiffs, however, contend that the party responsible for such trafficking, Ms. Salah, was not "personnel" of Main & Champ within the meaning of the relevant regulations.  After a review of the relevant case law, the Court cannot agree.  Furthermore, the Court finds that the due process claims raised in Plaintiffs' Complaint are without merit.

A.  <u>Permanent Disqualification Pursuant to 7 U.S.C. § 2021</u>

Pursuant to 7 U.S.C. § 2021(b), the FNS may sanction a participating SNAP firm if the store engages in the trafficking of food stamps.  7 U.S.C. § 2021(b)(3)(B).  The regulations clarify that the FNS shall "[d]isqualify a firm permanently if . . . [p]ersonnel of the firm have trafficked as defined in § 271.2 . . . ."  7 C.F.R. § 278.6(e)(1)(i).  Although the regulations do not define the term "personnel," the Sixth Circuit has "giv[en] the word its ordinary meaning" and "interpreted personnel to be 'a body of persons employed in some service or a body of employees that is a factor in business administration.'"  *Burch v. U.S. Dept. of Agric., Food & Nutrition Serv.*, 174 F. App'x. 328, 332 (6th Cir. 2006) (quoting *Bakal Bros., Inc. v. United States*, 105 F.3d 1085, 1089 (6th Cir. 1997)).

Furthermore, FNS is permitted to impose permanent disqualification on a firm even when

---

[9]  Pursuant to the relevant regulations, "[t]rafficking means  buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food . . . ."  7 C.F.R. § 271.2.

the store owner is "innocent" in relation to the trafficking that occurred. *Bakal Bros.*, 105 F.3d 1085, 1088–90 (6th Cir. 1997) (finding that an owner could be sanctioned for the actions of a seventeen-year-old stock boy who was not authorized to accept food stamps and committed the relevant trafficking in the store's parking lot). Specifically, the Sixth Circuit has emphasized that "a store is responsible for illegal trafficking by employees even if there is evidence that neither the owner nor manager of the store 'was aware of, approved, benefitted from, or was involved in the conduct or approval of the violation.'" *Id.* (quoting 7 U.S.C. § 2021(b)(3)(B)); *Goldstein* 9 F.3d at 523–24 ("[T]he regulations do not require that, before permanent disqualification is imposed, a store owner receive a warning, intend to violate the regulation or benefit rom the trafficking."); *Abboud, Inc. V. Glickman*, 156 F.3d 1228, 1998 WL 476134, at *2 (6th Cir. 1998) (table opinion) ("The law is clear that a store is responsible for food stamp violations of its employees or agents even though it had no knowledge of the violations."); *see also Burch*, 174 F. App'x at 333 ("[L]iability may attach the moment a firm's personnel engage in trafficking . . . there is no requirement that a liable store owner be provided with the opportunity to escape disqualification by renouncing the actions of his employees."). Other Courts of Appeals have reached similar conclusions. *See, e.g.*, *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (holding that 7 U.S.C. § 2021(b) permits the disqualification of innocent owners from the Food Stamp Program for trafficking); *Traficanti v. United States*, 227 F.3d 170, 174 (4th Cir. 2000) (holding that Congress "intended that *all* owners be subject at least to some penalty, regardless of fault").

In this case, personnel of Main & Champ committed the trafficking violations in question. Plaintiffs maintain that the Court should not consider them owners, and should not consider Ms. Salah personnel, for the purposes of the trafficking violations. The undisputed

facts reveal, however, that Plaintiffs owned the store during May, June, and July 2009. Pursuant to a December 2008 agreement, Plaintiffs ultimately purchased Champion Market in February 2009. Even before the closing of this purchase, Plaintiffs were in negotiations to sell the store to Ms. Salah. Nevertheless, Ms. Salah "wanted to test the business for a couple of months *before she would buy it*." (R. at 174 (emphasis added).) Accordingly, without transferring ownership, Plaintiffs' allowed Ms. Salah to take over operations of Champion Market. Tellingly, in February 2009, after Ms. Salah "took over" operations of Champion Market, Belal—as owner of Champion Market—applied for a food stamp license with FNS. (R. at 1–2, 174.) Furthermore, as Atef admits in his affidavit, he waited until July 2009 until he requested that Ms. Salah actually go through with the purchase of Champion Market. When she refused, Atef and Belal reclaimed operation of the store. Although Atef and Belal apparently hoped Ms. Salah would purchase the store, during the three months in question, ownership of Champion Market did not transfer. Instead, retaining ownership, Plaintiffs allowed Ms. Salah to operate and manage Champion Market. Under these circumstances, Ms. Salah fits within the confines of "personnel" under 7 C.F.R. § 278.6(e)(1)(I).

Furthermore, even assuming Ms. Salah committed all of the fraudulent activity Plaintiffs assert and was solely responsible for the trafficking which took place, permanent disqualification was still appropriate. As detailed above, a store may be permanently disqualified for trafficking even when the owner was innocent of, and did not benefit from, the trafficking that occurred. Plaintiffs rely on *Warren v. United States*, 932 F.2d 582 (6th Cir. 1991) to support their position that the Court should not hold them responsible for Ms. Salah's actions. Nevertheless, *Warren* is readily distinguishable. In *Warren*, the daughter-in-law of a former owner who had committed trafficking applied for a food stamp license after obtaining ownership of her father-in-law's

10

store. *Id.* at 583–84.  The Sixth Circuit held that it was inappropriate for FNS to deny the daughter-in-law's application, even though her husband had been a nominal owner during the time of the trafficking, because the facts presented no evidence that the daughter-in-law was trying to circumvent the prior disqualification. *Id.* at 587.  The current case, however, does not involve a food stamp application of a new owner.  Nor does the instant matter involve the issue of whether the application is an attempt to circumvent a prior disqualification.  Rather, it involves the decision to disqualify a present owner based on the acts of personnel.  The law makes clear that disqualification under such circumstances is appropriate.

The Court finds the situation in this case similar to the circumstances in the Sixth Circuit's decision in *Bakal Brothers*.  In *Balak Brothers*, the Sixth Circuit affirmed the disqualification of a store owner based on the trafficking actions of the store's seventeen-year-old stock boy who was not authorized to accept food stamps.  105 F.3d at 1088–90.  The trafficking was the result of the stock boy's independent actions and did not benefit the store.  *Id.*  Here, Plaintiffs maintain that Ms. Salah was not authorized to accept food stamps and that her trafficking did not benefit them.  Although Ms. Salah's fraudulent actions may have been more sophisticated then the actions of the stock boy, the basic principle remains the same.  Store owners are responsible for the independent trafficking of their personnel.  Moreover, in this case, it is apparent that Plaintiffs ignored red flags—such as Ms. Salah's unusual bank account demands—and failed to supervise Ms. Salah's operations of Champion Market during the months in question.

Ultimately, through the use of Plaintiffs' FNS authorization number, Ms. Salah committed food trafficking violations in Champion Market.  Because Ms. Salah was personnel of Plaintiffs, FNS acted within its authority under law to permanently disqualify Plaintiffs from

11

SNAP. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). Notably, FNS does have discretion to impose a civil penalty, in lieu of permanent disqualification, when a store produces substantial evidence of an effective policy to prevent trafficking violations and meets other factors. 7 U.S.C. § 2021(b)(3)(B). Plaintiffs appear at times to maintain that their removal of the food stamp license and the EBT machine from the store was equivalent to an effective compliance program. Because of the discretionary nature of this sanctioning option, however, the Sixth Circuit has held that when permanent disqualification is warranted under law, this Court may not review FNS's decision as to whether to impose a civil penalty. *Goldstein*, 9 F.3d at 524 ("As the decision to mitigate relates to the severity of the sanction, the FNS's denial of Goldstein's request for a civil money penalty in lieu of permanent disqualification is precluded from our review . . . ."); *Bakal Bros.*, 105 F.3d at 1089 ("The determination of the appropriate sanction is left to the discretion of the Secretary . . . . [T]his determination is not open to judicial review.") Accordingly, pursuant to Sixth Circuit precedent, this Court may not review FNS's decision to impose permanent disqualification rather than a civil penalty.

B.   Due Process Claims

In their Complaint Plaintiffs briefly allege that Defendant's actions have violated their substantive and procedural due process rights. In moving for summary judgment, Defendant contends that Plaintiffs' due process claims fail as a matter of law. In opposing summary judgment, Plaintiffs have not raised any argument as to their due process claims.[10] For the following reasons, and following the precedent of several Courts of Appeals, the Court finds that Defendant is entitled to judgment on Plaintiffs' due process claims.

---

[10] Under these circumstances, the Court finds that only limited analysis is necessary.

First, Plaintiffs substantive due process claim fails as a matter of law. "The test for a substantive due process claim is whether there is a fundamental right at stake, and if not, whether there exists a rational basis for the deprivation." *United States v. Hughes*, 632 F.3d 956, 962 (6th Cir. 2011). In this case, no fundamental right is at stake; it is clear that Congress mandated permanent disqualification to reduce instances of food stamp trafficking. *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) (citing S. Rep. No. 97-504, at 63-64 (1982)). The Court finds that punishing innocent owners, and thus placing an obligation on owners to supervise their stores, is rationally related to the goal of preventing food stamp trafficking. Multiple courts of appeals have reached similar conclusions. *See, e.g.*, *id.* at 1273–74 (holding that the permanent disqualification of an innocent store owner did not violate substantive due process); *TRM, Inc. v. United States*, 52 F.3d 941, 947 (11th Cir. 1995) ("Congress could rationally have concluded that a store owner who risks losing the ability to accept food stamps is more likely to be vigilant and vigorous in the prevention of employee trafficking."); *Traficanti v. United States*, 227 F.3d 170, 175 (4th Cir. 2000) ("A strict liability regime places ultimate economic responsibility for fraud on the owner, who is in the best position to deter deception *ex ante*."). Although it does not appear that the Sixth Circuit has reached this precise issue, the Court noted did note in *Bakal Brothers* "that Eleventh Circuit recently considered the issue and held that the imposition of strict liability upon innocent store owners does not violate the owner's substantive due process rights." 105 F.3d at 1090 (citing *TRM*, 52 F.3d at 944–47).

Second, Plaintiffs have endured no procedural due process violations in this case. Procedural due process generally requires notice and an opportunity to be heard. *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 830 (6th Cir. 2009). As Defendant notes in briefing, Plaintiffs had the opportunity to respond to the trafficking charges during the

13

administrative process.  Furthermore, Plaintiffs have exercised their statutory right to *de novo* judicial review before this Court.  *See Spencer v. U.S., Dept. of Agriculture*, 142 F.3d 436, 1998 WL 96569, at *3 (6th Cir. Feb. 27, 1998) (table) ("A de novo trial cures any denial of due process.") (citing *Kim*, 121 F.3d at 1275).  Accordingly, Defendant is also entitled to judgment on this claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 22) is **GRANTED**.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant and remove this case from the Court's pending case list.

**IT IS SO ORDERED.**

Date: August 24, 2011                                         /s/ *Elizabeth A. Preston Deavers*
                                                                              Elizabeth A. Preston Deavers
                                                                              United States Magistrate Judge